Herman BELL, Anthony Bottom and
Albert Washington, Petitioners,

v.

Thomas A. COUGHLIN, III, Commission-
er, New York State Department of Cor-
rectional Services; Louis Mann, Super-
intendent, Shawangunk Correctional
Facility; Charles Scully, Superintend-
ent, Greenhaven Correctional Facility;
and Dominic Mantello, Superintendent,
Wende Correctional Facility, Respon-
dents.

No. 89 Civ. 8408(MEL).

United States District Court,
S.D. New York.

Nov. 18, 1991.

As Amended Dec. 4, 1991.

Lawrence A. Vogelman, Barry C. Scheck and Ellen Yaroshefsky, Cardozo Criminal Law Clinic, assisted by Lawrence Reina, Lowell D. Kern, Andrew Weinstein, Mark Berman, Amy Gladstone, Law Graduates, Jedidiah Alpert, Law Student, New York City, and Brian Glick, New Rochelle, N.Y., Michael Spiegel and Judith M. Rosen, Dechert Price & Rhoads, New York City, for petitioners.

Robert M. Morgenthau, Dist. Atty. for New York County, New York City, for respondents; Mark Dwyer, Marc Frazier Scholl, Asst. Dist. Attys., of counsel.

LASKER, District Judge.

Herman Bell, Anthony Bottom, and Albert Washington were each convicted in New York State Supreme Court of two counts of murder in the first degree (former New York Penal Law §§ 125.25) for intentionally causing or intentionally aiding in the death of two New York City police officers, after a second trial,[1] and on May 12, 1975, were sentenced to concurrent indeterminate prison terms of twenty-five years to life. They now seek writs of habeas corpus pursuant to 28 U.S.C. section 2254 to set aside their convictions.

Nine grounds for relief are asserted:

1. The state court denied petitioners a fair hearing on trial witness Rubin Scott's post-trial recantation and his allegations of improper *ex parte* contact.

2. The post-trial hearing to determine the biases of a juror who knowingly engaged in improper conduct was inherently flawed: bias should be imputed to the juror, rendering unconstitutional the verdicts on which he voted.

3. The systematic exclusion of women from the venires from which petitioners' jury was selected violated their right to a trial by a jury chosen from a cross-section of the community.

4. The trial judge failed to conduct the constitutionally required inquiry into petitioner Washington's waiver of his right to counsel.

5. The prohibition of questions concerning FBI directives showing agent Wanamaker's bias and his motivation to lie denied petitioners their fundamental right to cross-examination.

6. Prosecutorial comment on petitioners' failure to testify constituted a violation of their fifth and fourteenth amendment rights.

7. The prosecution's circumstantial case, based solely on tainted sources, was insufficient to permit a verdict that petitioner Washington was guilty of murder beyond a reasonable doubt.

8. The court's biased and misleading charge to the jury denied petitioners their due process rights and right to a fair trial.

9. The prosecution (a) failed to correct police ballistics testimony which it knew, or should have known, was false; and (b) withheld exculpatory FBI ballistics evidence in its possession.

### I.

In early May 1971, Washington, Bell, Bottom, and Francisco Torres, traveled to New York. There, Francisco Torres' brother, Gabriel Torres, lived with his wife Linda Torres on Anderson Avenue in the Bronx. Also living there were Jacqueline Tabb, Francisco Torres' common-law wife, and Karen Parks, Tabb's sister. During May

---

1. The first trial ended in a mistrial on May 15, 1974, when the jury was unable to reach a verdict as to any of the criminal defendants. Both trials named Francisco and Gabriel Torres as defendants as well as petitioners. In the second trial, the case against the Torres brothers was dismissed at the conclusion of the prosecution's case.

1971, Bell, Bottom, Washington, the Torres brothers, Linda Torres, Jacqueline Tabb, and Karen Parks, regularly met in the apartment to talk about "radical politics."

According to the prosecution, shortly after Bell, Bottom, Washington, and Francisco Torres left California for New York, Rubin Scott, still in California received a message to ship some guns to New York, and Scott shipped a .45 caliber automatic pistol and a .38 caliber pistol to New York City by Greyhound Bus. In mid-May, 1971, Gabriel Torres went to the bus station in New York City and signed for a package which weighed ten pounds.

On May 21, 1971, at approximately 10:00 or 10:15 p.m., Officers Waverly Jones and Joseph Piagentini, responding to a routine call, stopped by 159–20 Harlem River Drive, part of the Colonial Park Housing Project in upper Manhattan. According to eyewitnesses, about fifteen minutes later as they emerged from the building, two men shot repeatedly and killed the officers. A Mustang parked in front of the building was processed for latent fingerprints because an eyewitness told the detectives that one of the killers had leaned against it. Five lifts of latent fingerprints and palmprints were obtained.

On August 27, 1971, three months after the May 21st deaths of the police officers, the police arrested petitioners Bottom and Washington in San Francisco. The gun of one of the slain police officers was in their possession. Also in the car in which they were arrested was a .45 caliber automatic pistol, later alleged to be one of the murder weapons. (Four .45 caliber bullets were recovered from an autopsy of Officer Jones, and one from an autopsy of Officer Piagentini. In addition, one .45 caliber bullet and six .45 caliber discharged shells were eventually retrieved from the scene of the crime.)

After trial, petitioners filed various appeals and motions to vacate, and on October 29, 1982, petitioners moved to vacate their convictions, on the basis of newly discovered evidence obtained from the FBI through a Freedom of Information Act request—FBI ballistics test results. On the basis of these documents, petitioners claimed that exculpatory information had been withheld from them by the state prosecutors. Petitioners also contended that a new trial was required because a principal witness, Rubin Scott, had recanted his trial testimony.[2] In 1984, petitioners requested that the trial judge recuse himself from hearing their motion to vacate because their motion included allegations that he had had improper *ex parte* communications with Rubin Scott. The judge declined to recuse himself, and on October 9, 1985, denied the motion to vacate. On January 14, 1986, the Appellate Division of the Supreme Court, First Judicial Department, denied petitioners appeal and denied permission to appeal to the Court of Appeals.

## II.

Rubin Scott, one of the prosecution's key witnesses at petitioners' second trial, recanted his testimony after petitioners' trial in two affidavits signed in 1977 and 1985.[3]

---

**2.** This claim had been raised in an earlier motion to vacate and denied on September 26, 1978.

**3.** The 1985 affidavit tracks the 1977 affidavit to a large extent, but contains some significant new details. Respondents assert that Scott's 1985 affidavit was not fairly presented to the state courts because it was not before the judge who heard the motion to vacate, and only submitted in connection with petitioners' appeal to the state appeals court from the denial of their motion to vacate. The question is whether submission of evidence to a state appeals court is sufficient for exhaustion purposes.

The Second Circuit has held that in order to meet the exhaustion requirement, a petitioner must have "set forth in state court all of the essential factual allegations asserted in his federal petition." *Daye v. Attorney General,* 696 F.2d 186, 191 (1982). Respondents claim that because the 1985 affidavit was not before the trial judge when he denied the post-judgment motion, to the extent it relies on the 1985 affidavit, the claim is unexhausted. In support of this position, they cite cases holding that a state court remedy is unexhausted where the petitioner presents his claim to the wrong state court by employing the wrong procedural device. However, in this case, petitioners employed the correct procedural device—a motion to vacate—and a full record of the relevant facts was developed at the trial court level. On appeal petitioners merely amplified a few facts in connection

On the basis of Scott's recantation, petitioners allege that their convictions were based upon perjury and that the trial judge engaged in improper *ex parte* contacts with ADA Tanenbaum and with Scott, and failed to make a full and timely disclosure of these discussions to the defense. Petitioners also assert that the trial judge should have recused himself from hearing the 1982 motion to vacate because the motion implicated him in serious misconduct, and that his failure to do so denied them a fair hearing on these claims.

However, the evidence on which petitioners base their allegations of improper *ex parte* contacts is extraordinarily weak, and Scott's recantation is neither credible nor material.

## A.

Rubin Scott was arrested in New Orleans on August 24, 1973, in connection with a bank robbery. According to Scott's 1977 affidavit, upon his arrest, he was tortured and repeatedly beaten by the New Orleans police, and interrogated by detectives from the NYPD about his knowledge of petitioner Herman Bell. In October 1974, after Scott was convicted of bank robbery and sentenced to fifteen years in a state facility, he asked the New Orleans police to contact the NYPD for him. According to his 1985 affidavit, because of constant abuse and threats, he "finally agreed to tell the police what they seemed to want so much for [him] to say." Scott told the NYPD detectives that he had been with petitioner Bell when Bell buried a gun he described as "hot" in Mississippi. He agreed to accompany NYPD officers to look for the gun that Bell had buried, and on November 18, 1974, a member of the excavating party found a .38 caliber gun which turned out to be the service revolver of Joseph Piagentini, one of the slain New York police officers.

On January 7, 1975, Scott was brought to New York to testify in petitioners' trial. On either January 17, 1975 (according to

petitioners) or February 21, 1975 (according to respondents), Scott asked again for a lawyer, and ADA Robert K. Tanenbaum, the chief prosecutor at petitioners' trial, told him that it would take too long to get him a lawyer but that he could speak to the trial judge instead. (Scott 1977 Affidavit). Scott was then taken to the judge's office and was left alone with him, at Scott's request. Scott stated in his 1977 affidavit that he told the judge that the testimony he had been planning to give—that he had watched Bell bury the gun of one of the murdered police officers—was false; that he had received the gun from someone unconnected with the killings; and that he himself had buried the gun.

Scott claims that in the days that followed, a number of prosecutors and the investigating officers came to see him and told him that he was lying and that he would be better off telling the truth. (Scott 1977 Affidavit) According to Scott, in the end, out of fear, he decided to change his testimony back to the one the police wanted to hear. "I was scared. I didn't know what Fenton or the others would do or if this would be just a continuation of what happened to me in New Orleans. Because of this fear, soon after I changed around and testified the way they wanted me to which is that Herman Bell did bury the gun in Mississippi." (Scott 1977 Affidavit).

On February 25, 1975, only four days after the date respondents contend the meeting between Scott and the trial judge occurred and over a month after the date petitioners claim the meeting took place, the trial judge met with defense counsel and informed them on the record of the conversation he had had with Scott. On March 24, 1975, Scott took the stand and testified about Bell's burial of Officer Piagentini's gun in Mississippi, Scott's shipment of guns to Bell in New York by Greyhound, and discussions he had had with the petitioners about "scoping pigs" in order to set them up to kill them.

with claims they had already asserted. Thus respondents' non-exhaustion argument with re-

spect to Scott's 1985 affidavit fails.

After petitioners' convictions, in 1977, Scott submitted an affidavit recanting his trial testimony. On the basis of that affidavit, petitioners made a motion to vacate in July 1977 pursuant to New York CPL § 440.10. That motion was denied on September 26, 1978, by the trial judge.[4]

In 1982, petitioners again moved to vacate their convictions, primarily on the basis of FBI ballistics reports; they also asserted claims that Scott's trial testimony was false and had been coerced and that the trial judge had engaged in improper *ex parte* contacts. In 1984, petitioners made a motion to disqualify the trial judge from deciding the motion to vacate. The judge declined to recuse himself and on October 9, 1985, denied the motion to vacate. In his written opinion, the trial judge stated, with regard to the recusal issue, that "were there the slightest shred of truth to any of these allegations, or even if there were material disputed questions of fact raised" he would recuse himself, but since there was not, he declined to do so. On January 14, 1986, the Appellate Division, First Department, determined that there was no question of law or fact present which ought to be reviewed by the Appellate Division, and denied petitioners permission to appeal to the Court of Appeals from the denial of their motion, exhausting petitioners' state remedies.

### B.

1. *Allegations of Improper Ex Parte Communications.*

■ The petitioners contend that the judge pressured Scott to give false testimony, called the prosecutor after the meeting and advised him to talk to his witness, turned Scott back over to the prosecution without notifying the defense, and did not notify the defense until over a month later. Respondents concede that during the *ex parte* meeting, Scott told the judge that the testimony he was about to give was false (the testimony that Bell buried the gun). However, the respondents contend that the purpose of the meeting was to answer Scott's questions concerning his immunity, not to discuss his proposed testimony at trial; that when Scott told the judge of his intent to recant, the judge simply stated that he would not countenance perjury one way or the other; that on that very same day the judge had an attorney assigned to Scott;[5] and that the defense counsel was informed of these events only four days later.

The petitioners assert that the judge secretly withheld Scott's recantation from them until over a month after the meeting took place, disputing the respondents' claim that the meeting took place on February 21, 1975, only four days before defense counsel was informed of Scott's recantation. In asserting this claim, however, the principal evidence petitioners have offered is a quasi-fictional account of the petitioners' trial, *The Badge of the Assassin*, co-authored by ADA Tanenbaum, the chief prosecutor on the case. Not only is a book of fiction, even one that bills itself as the "true story" of defendants' trial, never the most reliable source of evidence, but in this case, Tanenbaum himself has denied by affidavit the accuracy of the passages cited by petitioners.[6] Furthermore, the evidence presented by respondents is compelling: They have presented three affidavits—one each by ADA Tanenbaum and ADA Kenneth Klein, the lead prosecutors on the

---

**4.** On November 16, 1978, the Appellate Division, First Department, determined that there was no question of law or fact present which ought to be reviewed by the Appellate Division, and denied petitioners permission to appeal to the Court of Appeals from the denial of their motion.

**5.** Respondents offer an "assignment card" indicating that Herbert Adlerberg was assigned to represent Scott on February 21, 1975, as proof of this. They also point out that at trial Scott testified that a day or two after his conversation with the judge, Adlerberg was assigned to him. However, petitioners downplay this testimony noting that on cross-examination, Scott also testified that he was not sure how long after he met with the judge, he was assigned Adlerberg.

**6.** *Badge* describes Scott meeting with the trial judge on the second Friday after Scott's arrival in New York. Scott arrived in New York on January 7, 1975,—from this petitioners extrapolate that he must have met with the judge on January 17, 1975.

case, and one by NYPD detective Clifford Fenton who escorted Scott to the trial judge's office—all attesting that the meeting took place on February 21, 1975.[7] Thus the petitioners' proof is vastly outweighed by the strength of the evidence presented by the respondents. Moreover, the findings of fact made by the state court are entitled to deference in this proceeding absent convincing evidence to the contrary. *Sumner v. Mata*, 449 U.S. 539, 550–51, 101 S.Ct. 764, 770–71, 66 L.Ed.2d 722 (1981). In sum, petitioners have not presented sufficient evidence to undermine the state court's finding that the meeting occurred on February 21, 1975, and under the circumstances, no judicial misconduct has been proven with regard to the *ex parte* meeting with Scott.[8]

■ Petitioners also assert that the trial judge had another improper *ex parte* contact, this one with the prosecutor. According to petitioners, the trial judge telephoned ADA Tanenbaum immediately after his meeting with Scott to warn him to talk to his witness. In support of this claim, the petitioners present a passage from *The Badge of the Assassin* as their principal evidence. The respondents strenuously deny that such a conversation ever took place, and ADA Tanenbaum has testified by affidavit to this effect.[9] Even assuming that the phone call did take place and that it was ethically improper, it does not necessarily follow that a constitutional error occurred. Even where there has been an improper *ex parte* contact, absent some concrete prejudice there is no basis to disturb a trial verdict. *E.g., United States v.*

*Vaccaro*, 816 F.2d 443, 458 (9th Cir.), *cert. denied, Alvis v. United States*, 484 U.S. 914, 108 S.Ct. 262, 98 L.Ed.2d 220 (1987). In the instant case, even assuming the alleged *ex parte* telephone call occurred, petitioners have failed to demonstrate that they suffered prejudice as the result of these events and certainly have not established that their convictions should be reversed on this ground.

### 2. Scott's Recantation.

■ It is the law of this Circuit that motions in federal prosecutions raising "newly discovered evidence" claims on the basis of witness recantations are to be granted "only with caution" and are to be looked upon with "utmost suspicion." *United States v. Di Paolo*, 835 F.2d 46, 49 (2d Cir.1987). Indeed, when a claim for a new trial is based only on an "affidavit from a trial witness who recants [his or] her testimony" a judge can "ordinarily deny it without a hearing." *Di Paolo*, 835 F.2d at 51. Moreover, even where the recantation is credible, it must be of such an "extraordinary nature" that "but for the perjured testimony the defendant[s] would most likely not have been convicted." *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir.1988) (*Sanders I*), *appeal after remand, Sanders v. Sullivan*, 900 F.2d 601 (2d Cir.1990). In the case at hand, the petitioners' position fails to meet these criteria: Scott's recantation is neither credible nor material.

On one prior occasion (during his meeting with the trial judge), Scott recanted his

---

**7.** Scott did state in his 1985 affidavit, the one submitted after petitioners' 1982 motion to vacate was denied, that his meeting with the trial judge took place a week and a half after his January 1975 arrival in New York, corroborating the version in *Badge*. However, the credibility of Scott's 1985 affidavit is cast seriously in doubt by the fact that his original recantation affidavit signed in 1977, makes no mention of this fact.

**8.** Petitioners also claim that the trial judge put pressure on Scott to readopt his testimony after Scott recanted his testimony during their *ex parte* meeting. "[The judge] grew red in the face and became very angry. He tried to get me to say that I was lying to him and that I was

doing so to help Herman Bell." (Scott's 1985 Affidavit). However, Scott's original affidavit signed in 1977 did not contain any allegations of this kind; it was only after the trial judge denied the motion to vacate in 1985, that Scott submitted a new affidavit alleging that the trial judge put pressure to testify falsely on Scott. This 1985 affidavit is the only evidence petitioners submit to prove this point. This is simply insufficient to establish constitutional error.

**9.** The respondents concede that the prosecution learned of Scott's recantation before the defense did, but they contend that the prosecution learned of the recantation not from the trial judge but from Scott himself.

trial testimony; on that occasion, he adopted it again within a matter of days. This fact, by itself, seriously undermines the credibility of Scott's current recantation. Moreover, credibility determinations are precisely the type of issues in which the deference accorded to state court findings comes to the fore. The trial judge not only had an opportunity to observe Scott during the trial, he also saw and heard Scott make his prior recantation. In the circumstances, the judge's finding as to Scott's credibility is entitled to deference.

Furthermore, even assuming that Scott's post-trial recantation is considered credible, this is not a case where the jury implicitly trusted the witness at trial and the recantation comes as a complete surprise. Not only was the jury told of Scott's possible motives to lie, the defense was provided a full opportunity to cross-examine Scott about his "prior recantation" itself. Thus, the jury had both versions of Scott's story before it at the time it was asked to make its determination of the truth. In sum, Scott's current recantation is not of such an "extraordinary nature" that "but for the perjured testimony the defendant[s] would most likely not have been convicted," *Sanders v. Sullivan*, 863 F.2d at 226.

### 3. *Trial Judge's Failure to Recuse Himself.*

■ Finally, petitioners contend that the trial judge's failure to recuse himself from hearing their 1982 motion to vacate was constitutional error because the judge allegedly had a personal stake in the outcome of that motion and was an essential witness to disputed facts relating to that motion. It is the unusual case where a claim of disqualification based upon bias or prejudice rises to the level of a constitutional issue. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 820–21, 106 S.Ct. 1580, 1584–85, 89 L.Ed.2d 823 (1986) (citations omitted). However, the Supreme Court has held that where a judge has a "direct, personal, substantial, pecuniary interest"

in a decision, recusal is required under the due process clause. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. at 822, 106 S.Ct. at 1585 (citations omitted).

Petitioners characterize this case as one in which the judge has an "interest" in the outcome, but they cite no cases in which a "reputational interest" of the kind invoked here is sufficient to bring the case within the ambit of the rule. More importantly, even assuming the rule were to apply, petitioners have simply failed to make even a threshold showing that their allegations of judicial misconduct have any basis.[10] If mere allegations of judicial misconduct were sufficient, by themselves, to require recusal, it would wreak havoc on the criminal justice system. In sum, the petitioners have failed to establish that the trial judge's decision not to recuse himself was unjustified.

### III.

■ A week after the jury's verdict, juror Ivo Lanza informed the trial judge that before deliberations began he had received three anonymous telephone calls warning him that if he did not make sure that the defendants were not convicted, Mr. Lanza as well as his fellow jurors would be shot. It is unclear whether the calls were received at the end of the state's case or at the beginning of the defendants' case. In any event, at a post-trial hearing held by the trial judge, Mr. Lanza testified that after the second call he became so frightened he hired three bodyguards to accompany him to and from the courthouse. He stated that even during deliberations he did not feel completely safe and kept an eye out for sharpshooters on neighboring roofs. He assumed that the people making the calls were either from the defendants' "organization" or friends or supporters of the defendants. Finally, he explained that although he remembered the trial judge's instruction that all such contacts should be immediately reported to the court, he failed

---

**10.** We note that the information contained in Scott's 1985 affidavit was not before the trial judge when he denied the motion to recuse himself and thus petitioners cannot rely on its content in arguing that they made a sufficient threshold showing of judicial misconduct at the time that the judge decided the recusal motion.

to report these threats earlier because he thought the caller was someone who had been attending trial and felt he could not trust anyone in the courtroom.

The facts are agreed. The sole question is whether in the circumstances, petitioners' were denied a fair trial. Petitioners argue that it is inconceivable that Mr. Lanza could have remained impartial given the extraordinary measures he took to protect himself, and they point out that because Mr. Lanza failed to report these improper contacts to the court, he had a built-in motive to deny that the contacts affected his judgment because his only way to avoid criminal sanctions was to claim, falsely, that he had been "impartial" during jury deliberations. According to petitioners, a post-trial hearing is thus an inadequate remedy, and bias should be imputed to Mr. Lanza. The state responds that no exceptional circumstances here justify a departure from the usual deference afforded the trial court's factual determinations.

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a ... trial[ ] by an impartial jury...." The Supreme Court has long held that the remedy for allegations of juror impartiality is a hearing in which the defendant has the opportunity to prove actual bias, *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). In a recent case involving a claim of implied bias, the Supreme Court rejected the argument that a court cannot possibly ascertain the impartiality of a juror by relying solely upon the testimony of the juror in question. *Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 944–45, 71 L.Ed.2d 78 (1982). However, in her concurring opinion, Justice O'Connor "wr[o]te separately to express [her] view that the opinion does not foreclose the use of 'implied bias' in appropriate circumstances," *Smith v. Phillips*, 455 U.S. at 221, 102 S.Ct. at 948, and described what she characterized as several "extreme situations" that would justify a finding of implied bias. *Smith v. Phillips*, 455 U.S. at 222, 102 S.Ct. at 948.

On the record here it is certainly possible to infer from the evidence presented that bias existed. However, given the deference to which state court findings are entitled, there is an insufficient basis for overruling the finding of the state court. All the information that is presently of record was also before the trial judge. The trial judge was certainly in a position to judge Mr. Lanza's credibility since he observed the witness's demeanor at the hearing and was present at the trial. On that basis, the court found that Mr. Lanza's testimony that he was able to render an impartial verdict was credible. Given the deference accorded state court findings as well as the fact that that court heard and observed the witness in person and that no showing has been made that the trial judge was biased, the petitioners have not established their right to a new trial because of the threats to juror Lanza.

## IV.

■ Petitioners assert that their right to a jury chosen from a cross-section of the community was violated by the systematic exclusion of women from the venires from which their jury was selected. Former New York Judiciary Law § 599(7), which was in effect at the time of petitioners' jury selection, allowed women to opt-out of jury service. On January 21, 1975, the day that the first two jurors were selected, the Supreme Court decided *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), which held that the "selection of a petit jury from a representative cross section of the community is an essential component of the sixth amendment right to a jury trial" and thus, "women cannot be systematically excluded from jury panels from which petit juries are drawn." 419 U.S. at 533, 95 S.Ct. at 699. It was not until February 10, 1975 that all the jurors were sworn in the instant case and the selection of alternates began.

The question is whether *Taylor* has retroactive application to this case. In *Daniel v. Louisiana*, 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975), the Supreme Court held *Taylor* applicable to convictions obtained

by juries "empaneled and sworn" after the date of that decision, but it did not define the meaning of that term. 420 U.S. at 32, 95 S.Ct. at 705. Petitioners argue that *Taylor* applies to this case since it is obvious that the Supreme Court was referring to the swearing in of all of the members of the trial jury when it said "empaneled and sworn," and that that event occurred in this case one month after the *Taylor* decision. However, as late as 1980, the Court of Appeals of this Circuit indicated that the question whether a jury was "empaneled and sworn" upon its being summoned for duty or whether the operative event was the actual administration of the oath after the jury had been selected, was still an open one. *Alburquerque v. Bara,* 628 F.2d 767, 775 (2d Cir.1980).[11] If the question whether Taylor should be retroactively applied was unsettled as late as 1980, it certainly was not clear in 1975 when the petitioners' jury was chosen. Thus it was not constitutional error for the trial court in 1975 to deny petitioners' motion to strike their original venire on the basis of *Taylor.*

## V.

■ Washington contends that his constitutional rights were violated when he was allowed to proceed without counsel in the second trial without a judicial inquiry as to whether he knowingly and intelligently waived his right to counsel. Respondents argue that Washington's claim is either forfeited, unexhausted or equitably barred because of its long-delayed presentation, and that, with respect to the merits, the claim is factually frivolous. In any event, under the holding of *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), this Court is barred from hearing Washington's self-representation claim because the last state court to have ruled on this issue expressly relied upon an adequate and independent state ground—the state's forfeiture doctrine—in denying

Washington's claim.[12] In *Harris v. Reed,* the Supreme Court extended the "adequate and independent" state ground doctrine developed in *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), to federal *habeas* cases, holding that where "the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar," a federal court is barred from habeas review. *Harris,* 489 U.S. at 263, 109 S.Ct. at 1043 (citations omitted).

Washington did not advance any claim about self-representation at trial or in any of the state appellate briefs filed in his behalf on direct appeal. He presented this claim for the first time in 1981 in his second motion to vacate the judgement of conviction. The question is whether the state court relied upon an adequate and independent state ground in denying the motion to vacate.

In its original memorandum decision dated September 17, 1981, the trial court ruled solely on the merits of Washington's self-representation claim, concluding that no second waiver was required for the retrial since Washington had acted *pro se* in the first trial before a different judge:

> There is no merit to the claim that the defendant did not knowingly waive his right to counsel. He appeared in the first trial *pro se*, and chose that same status in the second trial for whatever advantages he deemed might accrue although he did, in fact, have ample opportunity to consult many times daily with able counsel for his co-defendants.

However, the state had also argued that the claim was "forfeited" under state law in opposing Washington's motion to vacate. The New York forfeiture doctrine bars litigation of claims which could have been presented on direct appeal. Apparently, through an administrative error, the state

---

**11.** Here, the jury venire of New York County had been created, selected, drawn, and assembled for prospective jury service before the *Taylor* decision, with two jurors sworn on the day *Taylor* was decided.

**12.** The motion to vacate was decided by the trial judge. On direct appeal, the Appellate Division of the Supreme Court, First Judicial Department, denied Washington's appeal and denied appeal to the Court of Appeals. Thus the trial judge is the last state court to have ruled on this issue.

court had not received the state's brief containing the procedural forfeiture argument at the time that it decided the motion. After the trial court issued its September 17, 1981, memorandum decision, therefore, the state moved to "resettle" the trial court's order to include the procedural ground, and on November 16, 1981, the court granted the motion to resettle and amended its prior decision to reflect that Washington's self-representation claim was also barred under the state's forfeiture doctrine:

> Moreover, the law is clear that issues which could have been raised by petitioner-defendant upon a prior appeal may not be reviewed by coram nobis application (*People v. Sadness*, supra; *People v. Contaldo*, 15 AD 2d 566 [222 N.Y.S.2d 741], aff'd 11 NY 2d 982 [229 N.Y.S.2d 423, 183 N.E.2d 701]; CPL §§ 440.-10[2][c] and [3][c] ).

Washington contends that the language in the state judge's amendment was the "very language" the Supreme Court rejected in *Harris v. Reed* as falling short of an explicit reliance on a state independent ground. However, the state court opinion in this case differs in important respects from that in *Harris*: (1) The state court cited case law and the appropriate statutory provision, (2) it used stronger language—such claims "may not be reviewed," not such claims "are considered waived," and (3) unlike *Harris*, the state court did not launch into an extensive discussion of the merits of petitioner's constitutional claim. Most importantly, the state court expressly included the state procedural ground in its amended order. Thus the requirements of *Harris*'s "plain statement" rule have been met. Accordingly, this court cannot review the state court's ruling as to the adequacy of the questioning concerning Washington's waiver of his right to counsel.

### VI.

■ Petitioners contend that the trial judge prevented the defense from conducting any meaningful cross-examination of a prosecution witness as to his bias against petitioners and motive to lie for the prosecution. They base this charge on the trial judge's limitation of questions concerning FBI counterintelligence programs directed at disrupting black nationalist organizations during the defense's cross-examination of FBI Agent Robert K. Wanamaker. Respondents argue that the claim is either unexhausted or forfeited, and that, in any event, the only questions which the trial judge limited were general questions about the FBI's attitude and practices concerning the "Black Panther Party" and that such limitations were within the trial court's discretion.

The United States Constitution protects the opportunity to cross-examine a witness with regard to bias and motivation to lie. *See Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). However, the Supreme Court has also ruled that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, ... prejudice, confusion of the issues, ..., or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Furthermore, the denial of a defendant's opportunity to impeach a witness for bias and motivation to lie, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis. *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438.

In the case at hand, petitioners have not shown that the jury might have assessed Agent Wanamaker's credibility differently had defense counsel been permitted to pursue his proposed line of cross-examination. The FBI documents submitted in connection with this allegation indicate only that in the early 70's the FBI might have arrested certain members of black nationalist groups with the purpose of intimidating activists and curtailing their activities; they do not suggest that FBI agents were encouraged to lie in order to convict members of black nationalist groups. The trial court acted within its discretion to limit cross-examination of Wanamaker on this material because of its remoteness to the subject at hand.

If, on the other hand, petitioners are claiming that Agent Wanamaker would have testified that the FBI had instructed its agents to lie and color their testimony in order to obtain convictions, the trial court still acted properly but for different reasons. First, it does not appear that the defense counsel would have had a good faith basis for asking such questions. Second, even if they had, the fact is that such questions were *not* prohibited. The trial court did not prohibit *all* inquiry into the possibility that Agent Wanamaker was biased or had a motive to lie as a result of FBI policies; it prohibited only questions which related primarily to the FBI's counterintelligence program and which related only tenuously to Agent Wanamaker's credibility. It is true that only one, arguably inadequate, question was asked on this point, and that one by the judge himself. However, this was not because such questions were foreclosed by the judge; the defense counsel did not pursue this line of questioning. The trial judge stated at one point during the exchange, "[y]ou can ask him other specific questions as to what he did, not what J. Edgar Hoover or anyone else thought or did in Washington, D.C.," and at another point, "[y]ou don't have to refer to directives from Washington if you want to ask whether he has a motivation to lie."

In sum, the petitioners have not established that the trial judge's limitation of questions concerning FBI directives regarding black nationalist organizations denied them a meaningful cross-examination of FBI Agent Wanamaker, and certainly not that it constituted harmful error beyond a reasonable doubt.

## VII.

■ Petitioners contend that the prosecuting attorney's comment on the defendants' failure to testify requires a new trial. The comment occurred while defense attorney Robert Bloom was cross-examining prosecution witness Karen Parks.

Q. Did you have any sexual relations with anybody in the time—

A. (Int'g) I just told you [that I did not].

Mr. Tanenbaum: I object to this Judge.

Mr. Bloom: The question was asked earlier—

Mr. Tanenbaum: I object and I would like to have a showing of good faith—

Mr. Bloom: The good faith, as I understand from people seated at the table—

Mr. Tanenbaum: Let them get on the stand and say it.

Both sides moved for a mistrial and curative instructions at this point. The mistrial was denied, but the trial court instructed the jury to disregard the comments.

I wish to instruct this jury that both [ ] statements were entirely out of order.

. . . .

[A]s I have told you, I am sure, and you have heard during the course of the voir dire literally hundreds of times, there is no obligation on the part of the defendants to testify in the case. They may testify if they wish. They do not have to testify and for the prosecutor at that stage, no matter what he deemed provocation to have been, to invite the defendants to testify or to imply that there be something wrong if they didn't testify as to a certain statement of facts, was [ ] entirely uncalled for.

. . . .

Now, there may be certain circumstances under which given that setting we could not go forward with the trial, but I think, under the circumstances here, with this jury having heard over a period of seven weeks, time and time again, that the defendants in this case have the right to testify and—have the right not to testify and that if they do not testify there should be no adverse comment on it and not adver inferences derived from it.

I am sure that this jury is not going to be influenced by one emotional statement during the course of the trial, and I am not going to stop the trial for that purpose; but I am instructing you again, that this is a vital and living principle that defendants may take the stand to testify, they may decline to testify. It would be improper for the prosecutor to comment on the fact that they do not testify, it would be improper for the jury

to draw inferences from the fact that they do not testify.

The fifth amendment forbids comment by the prosecution on the accused's silence. *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965), but to prove that a comment violates the rule, a petitioner must establish that the language used was "manifestly intended or ... of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Araujo*, 539 F.2d 287, 291 (2d Cir.), *cert. denied, Rivera v. United States*, 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976). Moreover, if curative instructions are given, as here, a petitioner must prove that any prejudice that might have existed was not cured by the court's instruction. Finally, even if a petitioner succeeds in establishing a constitutional violation, he must establish that the error was not harmless. *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

The prosecutor's comment was improper, as the trial judge noted in his curative remarks, but did not, in the circumstances, rise to a constitutional violation. Given the fact that the comment was made in the midst of a heated confrontation with defense counsel in reaction to a specific statement and implied only tenuously that the defendants' failure to testify was an indication of their guilt, any prejudice was limited. Above all, the impropriety of the prosecutor's remarks was corrected by the court's strongly worded, lengthy and immediate curative instructions.

## VIII.

Petitioners argue (1) that the prosecution presented insufficient evidence to convict petitioner Washington of the murders of Officers Piagentini and Jones on May 21, 1971, and (2) that errors in the trial court's jury instructions require reversal of their convictions. However, the standards for reversal on both grounds are extremely demanding, and petitioners have not met them in this case.

■ Under *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), a state conviction cannot be disturbed on habeas review of the sufficiency of the evidence unless "viewing the evidence in the light most favorable to the prosecution," a rational trier of fact could not have found the petitioners guilty beyond a reasonable doubt. 443 U.S. at 319, 99 S.Ct. at 2789. This determination must be measured in accordance with the New York law which defined the substantive elements of the crime at trial. The parties agree that under New York law Washington could have been convicted of intentional murder on an accomplice theory. A person is liable as an accomplice when:

acting with the mental culpability required for the commission [of the crime], he solicits, requests, commands, importunes, or intentionally aids [the person actually committing the murder] to engage in such conduct.

New York Penal Law § 20.00. Given the evidence of Washington's participation in the planning and execution of the murder, the evidence that he armed himself to join Bell and Bottom, and the fact that he was found in possession of one of the alleged murder weapons at the time of his arrest and "viewing the evidence in the light most favorable to the prosecution," the proof at trial of his guilt was sufficient.

■ With regard to the jury charge, petitioners contend that the trial judge marshalled the evidence in a biased way and that he gave confusing and misleading instructions as to the legal standards of proof. They argue that his actions, taken as a whole, deprived them of their due process rights to a fair trial. To obtain relief on such grounds, a petitioner must establish actual and substantial prejudice. The necessary showing "is even greater than the showing required [under federal law] to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (citations omitted). The question in a habeas proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the in-

struction is undesirable, erroneous, or even 'universally condemned.'" *Id.* Petitioners have not succeeded in meeting this burden.

## IX.

Finally, petitioners contend that the identification of a gun found in petitioners' Bottom and Washington's possession as one of the murder weapons—a fact practically unchallenged at trial and conceded by petitioners in their closing argument—was incorrect, and that the prosecutors had evidence in their possession which gave them reason to know that this was the case. On this basis, the petitioners allege two constitutional violations: *First,* the petitioners contend that the prosecution's failure to disclose FBI ballistics reports to the defense at the time of trial constituted a violation of its *Brady* duty to reveal to the defense all material exculpatory evidence in its possession. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Second,* the petitioners contend that the prosecution failed to correct material testimony which it knew, or should have known, was false when, on cross-examination, Detective George Simmons of the New York City Police Department ("NYPD") allegedly denied that any other agency had performed similar tests, and the prosecution did nothing to correct him, even though it knew or should have known his testimony was false.

## A.

On August 28, 1971, petitioners Bottom and Washington were arrested in San Francisco. A .45 caliber semi-automatic pistol was found in the car in which they were arrested. The car was later identified as belonging to petitioner Herman Bell.

On September 7, 1971, the FBI conducted tests comparing bullets test-fired from that pistol with bullets recovered from the homicide. Its findings were inconclusive. The FBI forensics laboratory in Washington, D.C., conducted tests comparing the gun [13] with two .45 caliber bullets and one .45 caliber cartridge shell retrieved from the scene of the crime.[14] Although the FBI lab was able to match the cartridge shell with the gun, it was unable to positively identify the two bullets as coming from the gun:

> Specimen Q5, a metal-jacketed bullet recovered at the scene in this case, was compared with the test bullets [shot from petitioners' gun] but *no conclusion could be reached* as to whether or not Q5 was fired from this weapon, *possibly due to changes through use in the barrel of the weapon* [ ] subsequent to the time Q5 was fired.
>
> Specimen Q6, a hand cast lead bullet recovered in this case was compared with the test bullets [fired from petitioners' gun] and *no conclusion could be reached* as to whether or not Q6 and the test bullets were fired by the same weapon, *possibly due to the fact that lead bullets and metal jacketed bullets are not comparably marked as they pass through the barrel of a weapon.*

(Petitioners' SE 2, 9/13/71 FBI internal memorandum to SAC San Francisco) (emphasis added). The petitioners claim that these results were sent to both the NYPD and ADA Robert K. Tanenbaum, the lead prosecutor on the case.

On September 24, 1971, the NYPD ran its own tests. Its ballistics expert Detective George Simmons tested petitioners' gun with six different .45 caliber bullets and six different .45 caliber shells recovered from the scene of the crime and determined, with respect to the bullets, that two of the bullets were too deformed to test, and all four of the recovered "testable" bullets matched with petitioners' gun.[15]

---

**13.** In fact, the FBI was sent only test cartridges and test bullets fired from the gun, not the actual gun.

**14.** A total of six .45 caliber bullets and six .45 caliber cartridge shells were recovered from a search of the crime scene and from autopsies. In the tests run on September 7, 1971, the FBI tested only two of those bullets and one of those cartridge shells.

**15.** With respect to the shells, Detective Simmons found that five of the six retrieved shells matched petitioners' gun. Detective Simmons testified that he could not match the other shell. This shell, which was marked B–3, was the one

According to petitioners, although both the NYPD and the District Attorney's office knew of the FBI ballistics tests, only Simmons' tests were disclosed to the defense and introduced at trial. Detective Simmons testified at length about his findings at trial, and his conclusions constituted the only ballistics evidence in the record.

For whatever reason, petitioners did not seek to run ballistics tests of their own; they simply accepted the NYPD results on their face and proceeded to develop their trial strategy on the assumption that the NYPD's identification of the gun found in petitioners Washington and Bottom's possession as the murder weapon was incontestable.[16] Petitioners were so sure they could not win this point that they appear to have conceded it in their closing statement.

### B.

▇▇▇ Where the government uses perjured testimony in obtaining a conviction, and knew or should have known of the perjury, the defendant's due process right to a fair trial is violated "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959) (citations omitted). This rule applies when the prosecution "knew or should have known" that the testimony was false," *Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397, "whether the nondisclosure was the result of negligence or design." *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

Once the use of false testimony is established, the burden shifts to the prosecution to prove absence of harmful error. The Supreme Court has recently noted that under the *Agurs* standard, "the fact that testimony is perjured is considered material unless failure to disclose it would be harmless beyond a reasonable doubt." *United States v. Bagley*, 473 U.S. 667, 680, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (1985) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); *see also United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991).

Where there is insufficient evidence of perjury, the threshold of materiality is much higher: There must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. In such circumstances, what is required is a probability not just a "possibility" that the jury would have reached a different result. *United States v. Petrillo*, 821 F.2d 85, 88–89 (2d Cir.1987). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383.

A substantial showing has been made by petitioners that exculpatory information may have been withheld. However, *Chapman* does apply and we are obligated to made a determination whether this error was harmless even if it occurred. *United States v. Bagley*, 473 U.S. 667, 680, 105 S.Ct. 3375, 3382, 87 L.Ed.2d 481 (1984). The briefs are quite helpful in this regard, but because the issue is as fact-laden as it is, and because the original oral argument dealt with all nine issues thereby foreclosing detailed discussion of the harmless error issue with regard to the ballistics tests, I conclude that further oral argument directed exclusively to the question of whether if perjury or withholding of evidence occurred, it would have been harmless error, is required. After such argument, a final determination will be made as

---

cartridge shell that the FBI was sent to test and that the FBI matched positively in its findings.

**16.** For example, defense counsel argued repeatedly that petitioners could not be the murderers because the people who actually did the killing would either have gotten rid of the guns or, if they were going to keep them, altered them in terms of the barrel configuration, so that they could not be traced. The prosecution countered by asserting that the defendants kept the guns because they were the "badge of the assassin."

to whether an evidentiary hearing is necessary.

Decision on this aspect of the petition is therefore reserved pending the holding of a hearing for a determination of this issue. On all other grounds the petitions are dismissed.

It is so ordered.